Macdonald, D. Lloyd, J.
The defendant seeks to suppress the cocaine that was seized from his vehicle. He submits that due to his limited proficiency in English, he did not knowingly consent to the search. For the same reason, he states that he was unable to understand the Miranda warnings and, thus, that his waiver of his right to silence was neither knowing nor voluntary. The motion is DENIED.
Principles
Consent searches are closely scrutinized. The burden is on the Commonwealth to demonstrate that consent was freely and voluntarily given and that permission was “something more than mere acquiescence.” Commonwealth v. Rogers, 444 Mass. 234, 237-38 (2005). No single factor is conclusive; the absence of advice that the party has a right to refuse a request is but one such factor. Commonwealth v. Carr, 458 Mass. 295, 302 (2010).
“If an interrogation is custodial in nature, the Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant made a valid waiver of Miranda rights ... To be valid, the waiver of Miranda rights must be made knowingly, intelligently, and voluntarily. The validity of a waiver is assessed in light of the totality of the circumstances, which includes, inter alia, the defendant’s age, education, intelligence and emotional stability.” Commonwealth v. Hilton, 443 Mass. 597, 605 (2005) (internal quotes and citations omitted).
Findings
The defendant was born in Puerto Rico and moved to New Bedford approximately two years before he was arrested. On the evening of the incident, Februaiy 3, 2011, he was driving a Jeep Cherokee on Sawyer Street in the North End of New Bedford. When the defendant failed to come to a complete stop at the stop sign at the Sawyer Street intersection with Acushnet Avenue, Massachusetts State Trooper Brian Anderson (“Anderson”) of the Gang Unit Task Force stopped him. Anderson was driving an unmarked police vehicle with two other officers behind the defendant’s car. In the passenger seat next to Anderson was Det. Sgt. David Wells (“Sgt. Wells”) of the State Police. In the rear seat was Detective Gangi (“Gangi”) of the New Bedford Police Department.
The area of the stop is a high crime/high drug activity part of the City. There had recently been a gang-related homicide within a few blocks of where the stop took place.
Anderson approached the driver’s side of the defendant’s Jeep, Sgt. Wells the passenger side, and Gangi covered from the rear.
*441 As Anderson asked the defendant for his license and registration, Sgt. Wells, who had directed his flashlight through the passenger window to illuminate the front seat, noticed in an open area on the center console a “plastic twist.” A plastic twist is a common form of packaging for narcotic street sales. Anderson and Sgt. Wells had seen plastic twists so used hundreds of times in their respective law enforcement careers. Over the windshield of the Jeep, Sgt. Wells informed Anderson what he had seen as Anderson was otherwise conversing with the defendant.
The defendant’s license and registration were in order, but when Anderson then asked the defendant whether there were any drugs in the car, the defendant denied it. Anderson then asked the defendant if he (Anderson) could look inside. The defendant responded, “Yes, fine.”
After the defendant stepped out of the car, Anderson checked the plastic twist. It was empty except for a green residue and a “stem.” However, when Anderson looked closer at the two-cupholder area of the console, he discovered a plastic bag containing what he believed to be crack cocaine.
Anderson then informed the defendant that he was under arrest and read him, in English, his Miranda warnings. The defendant acknowledged that he understood them and agreed to speak to Anderson. Anderson asked him what was in the bag. The defendant responded, “Eights.” Anderson recognized “Eights” as a common term in the street narcotics trade for 1/8 ounce of cocaine — also commonly referred to as an “8 ball.”
Anderson then asked the defendant whether there were any further drugs in the car. The defendant, who at this point was handcuffed, responded affirmatively and pointed with his chin to an area in the ceiling above the steering wheel and the driver’s seat, where the headliner of the ceiling meets the front windshield. Anderson reached in and pulled on the headliner, and a bag with a white substance fell out. He looked behind and found two more bags. Two of the bags contained crack cocaine, one powdered cocaine.
Anderson asked the defendant whether he worked. The defendant responded that he had a job at a coupon business in Taunton and made $8.25/hour.
The defendant showed no hesitation in responding to Anderson’s questions and exhibited no physical conduct (body movements or voice) that would be consistent with his not understanding what Anderson was saying. The defendant was affirmatively cooperative with the police at the scene, so much so that in the police report prepared on the incident it was recorded that the defendant was unusually “polite.”
Sgt. Wells booked the defendant. The defendant answered all of Sgt. Wells’s questions in English and exhibited no hesitancy in understanding. He identified his employer in Taunton and described his job as a “machine operator.” As with Anderson, Sgt. Wells found that the defendant was responsive and gave answers that were appropriate to the subject matter of the inquiries.
The defendant did not testify, nor did he call any regular witnesses. Rather, he called an expert witness, Dr. Michael O’Laughlin (“Dr. O’Laughlin”), who is a certified Spanish interpreter in California and Massachusetts and is Director of Interpreter Training at Boston University. O’Laughlin speaks multiple languages and has a masters degree in theology from Oxford and a Ph.D. in New Testament studies from Harvard. He is in charge of testing for admissions to the B.U. program.
Dr. O’Laughlin administered an English proficiency test (referred to by the acronym, “B.E.S.T”) to the defendant. The defendant scored 222 out of 999, which on a scale of zero to 10 of proficiency qualified as a zero. Dr. O’Laughlin was of the opinion that the defendant did not understand Anderson’s question as to whether it was okay for Anderson to search the car. And O’Laughlin was of the further opinion that the defendant was incapable of understanding the Miranda warnings administered to him by Anderson and incapable of knowingly waiving them.
The Court found both Anderson and Sgt. Wells credible as to their descriptions of their exchanges with the defendant and the defendant’s demeanor in responding to their inquiries.
Dr. O’Laughlin is experienced and credentialed, but his assessment of the defendant was based on a test which the defendant had a compelling interest to fail. Further, it appears that Dr. O’Laughlin’s practice in providing expert testimony is geared, for all practical purposes, exclusively to the defense community. In contrast to the officers’ in-person interaction with the defendant at the scene and at the station, Dr. O’Laughlin’s interaction — through no fault of Dr. O’Laughlin — was in a clinical setting at the behest of the defendant’s counsel.
The Court places particular significance on the contemporaneous description in the arresting officers’ incident report that the defendant was unusually cooperative and polite. This is a circumstance that is consistent, in the Court’s judgment, with the account that the defendant was knowledgeable of the choices facing him as described by Anderson. This perception is reinforced by the defendant’s responsive manner at booking testified to by Sgt. Wells.
Conclusion
The defendant voluntarily consented to the search and knowingly and willingly waived his right to silence after having been duly informed of his Miranda rights.
ORDER
The defendant’s motion to suppress is DENIED.